**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ANN S.,

                  Claimant,

        v.

ANDREW SAUL, Commissioner
of Social Security,

              Respondent.

No. 19 CV 1661

Magistrate Judge Jeffrey T. Gilbert

**MEMORANDUM OPINION AND ORDER**

Claimant Ann S.[1] ("Claimant") seeks review of the final decision of Respondent Andrew Saul,[2] Commissioner of Social Security ("Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 8]. The parties have filed cross-motions for summary judgment [ECF Nos. 14, 23] pursuant to Federal Rule of Civil Procedure 56. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). For the reasons discussed below, Claimant's Motion for Summary Judgment [ECF No. 14] is granted in part, and the Commissioner's Motion [ECF No. 23] is denied in part. This matter is remanded to the Social Security Administration for further proceedings consistent with this Memorandum Opinion and Order.

---

[1] Pursuant to Northern District of Illinois Local Rule 8.1 and Internal Operating Procedure 22, the Court will identify the non-government party by using her full first name and the first initial of her last name.

[2] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), the Court has substituted Commissioner Saul as the named defendant.

## PROCEDURAL HISTORY

On December 18, 2014, Claimant filed a Title II application for DIB alleging disability beginning on September 30, 2014. (R. 299-300). Her claim was denied initially and upon reconsideration, after which Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (R. 161-71). On April 26, 2017, Claimant appeared and testified at an initial hearing before the ALJ. (R. 24-64). The ALJ also heard testimony on that date from vocational expert ("VE") Dennis W. Gustafson. (R. 24-64). After the hearing and at Claimant's request, Claimant subpoenaed medical records from Claimant's therapist, Mr. Thomas Buonomo, LMHC. (R. 903-21). She received and considered those records, and also received completed interrogatories on September 25, 2017 from independent medical expert Dr. Varsha Gillala. (R. 923-37). On April 20, 2018, ALJ held a supplemental hearing where Claimant, VE Richard T. Fisher, and another medical expert, Dr. Kathryn Rohr, M.D., testified. (R. 65-102).

On July 5, 2018, the ALJ denied Claimant's claim for DIB after considering her limitations. (R. 134-51). In finding Claimant not disabled, the ALJ followed the five-step evaluation process required by Social Security regulations for individuals over the age of 18. See 20 C.F.R. § 416.920(a). At step one, the ALJ found that Claimant did not engage in substantial gainful activity since her alleged disability onset date of September 30, 2014. (R. 137). At step two, the ALJ found that Claimant had a severe impairment or combination of impairments as defined by 20 C.F.R. 404.1520(c). (R. 137-38). Specifically, Claimant suffered from affective disorder, anxiety disorder (panic without agoraphobia),[3] post-traumatic stress disorder, and hypertension. (R. 137). The ALJ

---

[3]  There is conflicting evidence in the medical record as to whether agoraphobia was a component of Claimant's panic disorder. Dr. Michael Greenberg, Ph. D, a Florida state consultative psychologist, examined Claimant on April 28, 2015 as part of her disability application. Dr. Greenberg diagnosed Claimant with recurrent and moderate major depressive episodes, chronic PTSD, and panic disorder with agoraphobia in the form of limited phobic avoidance. The ALJ considered Dr. Greenberg's opinion, (R. 142), although she did not specify how much weight it was due. Claimant's therapist, Mr. Buonomo,

also concluded that as of May 15, 2015, Claimant had severe degenerative disc disease as a result of injuries sustained in two car accidents.[4] (R. 137). The ALJ also acknowledged several non-severe complaints – obesity, status-post tendon repair, and carpal tunnel syndrome – and concluded that although they did not rise to the level of severe impairments, she would nevertheless address or incorporate Claimant's limitations from each of these areas into the RFC, if appropriate. (R. 137-38).

At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 138). The ALJ considered listing 1.04 for disorders of the spine, as well as listings 12.04, 12.06, 12.15 for Claimant's mental impairments. (R. 138-39). As for listing 1.04, the ALJ noted that Claimant did not have the neurological deficits necessary to satisfy listing 1.04A, nor did she have the spinal arachnoiditis for listing 1.04B or lumbar spinal stenosis resulting in pseudo-claudication for listing 1.04C. (R. 138). Listings 12.04, 12.06, and 12.15 were also not satisfied, the ALJ reasoned, because Claimant did not meet either the "paragraph B" or "paragraph C" criteria. (R. 139-40). Although Claimant did have moderate limitations in all four functional areas – (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself – the ALJ concluded that the "paragraph B" criteria were not satisfied because Claimant's mental impairments did not result in two "marked" limitations or one "extreme"

_____

diagnosed Claimant with panic disorder without agoraphobia. (R. 492). Ultimately, the ALJ concluded that the appropriate diagnosis for Claimant was panic disorder without agoraphobia, but on remand, this point may require clarification as part of the ALJ's reexamination of Claimant's mental limitations.

[4] The ALJ noted that prior to May 15, 2015, Claimant did have some degenerative changes. These changes were exacerbated, however, by injuries from two car accidents that occurred on May 15, 2015 and September 18, 2015.

limitation. (R. 138-39). Nor were the "paragraph C" criteria satisfied, as the ALJ concluded that the file contained no support for marginal adjustment of the minimal capacity to adapt to changes in the environment or to demands that are not already part of daily life. (R. 139).

The ALJ then found Claimant had the RFC,[5] from September 30, 2014 through May 14, 2015, to:

> "perform medium work as defined in 20 CFR 404.1567 but is limited to work that involving [sic] simple, routine and repetitive tasks, in a work environment free of fast-paced production requirements, requiring only simple, work-related decisions, with few, if any, work place changes, and occasional interaction with the public and co-workers." (R. 139).

Beginning on May 15, 2015, the ALJ found Claimant had the RFC to:

> "perform light work as defined in 20 CFR 404.1567 subject to never climbing ladders, ropes or scaffolds, frequent stooping and crouching, avoidance of all exposure to use of dangerous moving machinery and unprotected heights. She remains limited to work involving simple, routine and repetitive tasks, in a work environment free of fast-paced production requirements, requiring only simple, work-related decisions, with few, if any, work place changes, and occasional interaction with the public and co-workers." (R. 139).

Based on this RFC, the ALJ found at step four that Claimant had past relevant work as a radio dispatcher but that she was unable to perform this work, as it requires semi-skilled tasks that are precluded by Claimant's mental health limitations. (R. 149). At step five, the ALJ concluded that, considering Claimant's age, education, past work experience, and residual functional capacity, she is capable of performing other work within the national economy and that those jobs exist in significant numbers. (R. 150-51). Specifically, the VE's testimony from the 2017 hearing identified jobs at the medium level that would be available to Claimant in the national economy as an industrial cleaner, (R. 57, 150), and jobs involving light work in the general area of housekeeping cleaning work, or building cleaning. (R. 58). The VE's testimony from Claimant's

---

[5] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite [her] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008).

second hearing in 2018, on which the ALJ also relied, identified light, unskilled jobs including as a marker, routing clerk, or mail clerk that would be available to Claimant in significant numbers. (R. 92). The ALJ then concluded, based on the testimony of both VEs, that Claimant would be able to perform jobs including as an industrial cleaner for the period of September 30, 2014 through May 14, 2015. (R. 150). After May 15, 2015, the ALJ noted that Claimant could perform work as a marker, routing clerk, or mail clerk. (R. 150-51). The ALJ then found Claimant was not disabled under the Act. (R. 151). The Appeals Council declined to review the matter on September 18, 2018, (R. 1-3), making the ALJ's decision the final decision of the Commissioner and, therefore, reviewable by this Court. 42 U.S.C. § 405(g); *see, e.g., Smith v. Berryhill,* 139 S. Ct. 1765, 1775 (2019); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Judicial review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his or her decision. *See Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted); *see also, Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Biestek,* 139 S. Ct. at 1154; *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even where there is adequate evidence in the record to support the

decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (internal quotations omitted). In other words, if the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008) (internal quotations omitted). The reviewing court may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## ANALYSIS

Claimant raises three substantive points on appeal. First, she argues that the ALJ incorrectly concluded that her mental limitations did not meet listing level severity at step three. Second, Claimant asserts that the RFC did not adequately capture her mental limitations, nor was it supported by substantial evidence. Finally, Claimant argues that ALJ erred in weighing the testimony and opinion evidence presented at both hearings. This Court disagrees that the ALJ's step three analysis was deficient and also finds that the ALJ's assessment of the opinion evidence and Claimant's own subjective symptom statements was not patently wrong. On the limited issue of whether Claimant's mental limitations were adequately incorporated into the RFC, however, the Court agrees that the ALJ ultimately did not support her determination of Claimant's mental RFC with substantial evidence, nor did she build an accurate and logical bridge between Claimant's mental limitations and the restrictions contained in the RFC. Further, the ALJ's hypotheticals to the VEs at both hearings did not include sufficient information about Claimant's limitations to elicit an opinion from the VEs on which the ALJ or this Court can rely with

confidence. For the reasons explained below, this case is remanded for further consideration of Claimant's mental limitations.

### I.      The ALJ's Step Three Analysis and Listing 12.04

Claimant first argues that the ALJ erred when she concluded Claimant does not meet the listing requirements of section 12.04, which involves depressive, bipolar and related disorders. According to Claimant, the ALJ should have accepted the opinion of Dr. Gillala, a doctor of osteopathy with board certification in physical medicine and rehabilitation, that Claimant's mental limitations met the criteria of listing 12.04 and ended the step three inquiry there. [ECF No. 14] at 10. Even if Dr. Gillala's opinion did not carry the day, Claimant characterizes the ALJ's step three analysis – in particular, her assessment of the paragraph B functional criteria – as inadequate. [ECF No. 14] at 9-11. The Court disagrees on both counts. The ALJ was not required to accept Dr. Gillala's conclusory and unsupported opinion about Claimant's mental health limitations, and she supported her conclusion that Claimant did not meet or medically equal listing 12.04 with substantial evidence after a fulsome analysis of the paragraph B criteria. The Court therefore finds no error in the ALJ's step three analysis, as discussed further below.

A claimant "suffering from an affective disorder meets the listed severity level for a depressive syndrome if enough listed factors (the 'A criteria') are present." *Larson v. Astrue*, 615 F.3d 744, 747-48 (7th Cir. 2010) (quoting 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.04(A)). Here, the ALJ and the parties appear to agree that Claimant's affective disorder, anxiety disorder, and post-traumatic stress disorder qualify as severe for purposes of the "paragraph A" criteria. (R. 137-38); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.A ("Medically documented persistence, either continuous or intermittent, of…[d]epressive syndrome" with at least four of the following – anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in

weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; or hallucinations, delusions, or paranoid thinking).

Once the "paragraph A" criteria are satisfied, a claimant must also meet either the "paragraph B" or "paragraph C" criteria of that listing. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04. The "paragraph B" criteria require the presence of at least two of the following for a claimant to be considered *per se* disabled: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked deficiencies of concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.04(B); *see also, Craft,* 539 F.3d at 674-75; *Larson,* 615 F.3d at 748. Alternatively, a claimant may satisfy "paragraph C" of the listing, which involves a medically documented history of a chronic applicable disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.04(C).

It is Claimant's burden to show not only that her impairments meet a listing, but that her impairments satisfy all of the various criteria specified in the listing – in this case, listing 12.04.[6]

---

[6] Claimant generally asserts that the ALJ erred by "fail[ing] to assess listing level severity" for Claimant's mental impairments. [ECF No. 14] at 10. Claimant does not, however, identify which of the three listings

*Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999); *see also, Sullivan v. Zebley,* 493 U.S. 521 (1990); SSR 91–7c at 4. Yet Claimant here presents minimal evidence beyond her own subjective symptom reports and Dr. Gillala's unsupported medical opinion outside her area of expertise that she satisfies the criteria of listing 12.04. [ECF No. 14] at 9-13. Indeed, the main thrust of Claimant's argument appears to be that she automatically meets listing 12.04 for depressive, bipolar and related disorders because an osteopath with no mental health qualifications so opined.[7] This is insufficient. *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015) (at step three, the ALJ cannot substitute a claimant's allegations of pain or other symptoms for a missing or deficient sign or laboratory finding, such as objective medical evidence, to raise the severity of an impairment to that of a listed impairment) (citing 20 C.F.R. § 404.1529(d)(3)). Claimant cannot satisfy her burden at step three by simply cherry-picking favorable testimony and subjective symptom reports from the evidence of record and making blanket assertions that she satisfies listing 12.04. *Sullivan v.*

---

that the ALJ considered – listings 12.04, 12.06, and 12.15 – Claimant thinks she does in fact meet. [ECF No. 14] at 9-10. That Claimant did not explain how her impairments satisfy the various criteria for a particular listing not only goes to Claimant's failure to meet her burden at step three, but also leaves this Court to guess how, and to what listing, it should apply Claimant's substantive arguments. Because listing 12.04 is the only listing Claimant mentions in her argument, [ECF No. 14] at 10, albeit only in passing, the Court will construe her claims of error at step three as pertaining to listing 12.04.

[7] Claimant briefly argues in her reply that perhaps the ALJ should have called an independent medical expert to review Claimant's mental limitations and Dr. Gillala's opinion that Claimant met the requirements of listing 12.04. [ECF No. 24] at 1-2. The ALJ does have a duty to develop a develop a full and fair record, *Nelms,* 553 F.3d at 1098, but it is Claimant's burden, not the ALJ's, to prove she is disabled. *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017) (citing *Meredith v. Bowen*, 833 F.2d 650, 655 (7th Cir. 1987); 20 C.F.R. § 404.1512(a)(1)). Particularly where the Claimant was represented by counsel during the proceeding, as here, courts give "deference to an ALJ's decision about how much evidence is sufficient to develop the record fully and what measures (including additional consultative examinations) are needed in order to accomplish that goal." *Poyck v. Astrue*, 414 F. App'x 859, 861 (7th Cir. 2011) (citing *Nelms*, 553 F.3d at 1098; *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993)). To that point, although the Court affords deference to the ALJ's decision not to seek testimony from an independent medical expert during the 2017 and 2018 hearings, the Court leaves the matter to the discretion of the ALJ on remand as to whether independent medical opinion would clarify Claimant's mental limitations and streamline the RFC assessment. *See Luna v. Shalala*, 22 F.3d 687, 692-93 (7th Cir. 1994) (citing *Kendrick*, 998 F.2d at 456-57 ("…how much evidence to gather is a subject on which we generally respect the Secretary's reasoned judgment.")).

*Zebley*, 493 U.S. 521, 531 (1990). Claimant provides the Court with no meaningful avenue to disturb the ALJ's substantive finding.

The ALJ here conducted a fulsome analysis of Claimant's mental limitations and the "paragraph B" criteria described above. "To determine whether an individual is disabled at step 3, an ALJ must follow 20 C.F.R. § 404.1529(d)(3), which describes how the agency decides whether the individual's impairment or combination of impairments are medically equal in severity to an impairment on the list of pre-determined disabling impairments." *Curvin*, 778 F.3d at 650. When evaluating a Claimant's condition and a listed impairment, an ALJ must discuss the listing by name and offer "more than a perfunctory analysis of the listing." *Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir. 2004) (citing *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2002); *Scott v. Barnhart*, 297 F.3d 589, 595–96 (7th Cir. 2003); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)). But while an ALJ has the obligation to consider all relevant medical evidence, she need not mention every piece of evidence, so long she builds a logical bridge from the evidence to her conclusion. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008).

The special technique in 20 C.F.R. § 404.1520a is used to analyze "whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations." *Craft,* 539 F.3d at 674. It requires an ALJ to first evaluate the claimant's symptoms, 20 C.F.R. § 404.1520a(b)(1), and, if the ALJ finds those symptoms amount to a medically-determinable impairment, to then rate the degree of limitation that the claimant experiences across four areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id*. § 404.1520a(c)(3). The ALJ must document use of the special technique by incorporating the pertinent findings and conclusions into the written decision and must elaborate on significant medical history. *Id*. § 404.1520a(e)(2). This includes examination

and laboratory findings, as well as the functional limitations that were considered in reaching a conclusion about the mental impairment's severity. *Id*. Finally, the decision must also incorporate "a specific finding as to the degree of limitation in each of the functional areas." *Id*.

In the section of her opinion specifically designated for the step three analysis, (R. 138-39), it is true that the ALJ did not discuss the symptoms and signs of Claimant's affective disorder, anxiety disorder, or post-traumatic stress disorder, even though she acknowledged at step two that these diagnoses constituted severe impairments. Instead, the ALJ went straight to the "paragraph B" criteria and described Claimant's functional limitations in the following five sentences:

> "In understanding, remembering, or applying information, the claimant has a moderate limitation. In interacting with others, the claimant has a moderate limitation. With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. As for adapting or managing oneself, the claimant has experienced a moderate limitation. I discuss these functional areas in detail below." (R. 139).

The ALJ then concluded, after minimal discussion of the "paragraph C" criteria, that Claimant did not meet a listing level mental impairment and proceeded to step four.

In her RFC analysis, the ALJ picked up with her discussion required by the special technique and outlined the signs and symptoms of Claimant's mental limitations. The ALJ noted that Claimant suffered from panic attacks, depression, memory problems and inattention due to her mental health issues, (R. 146), and also discussed the treatment Claimant did and did not receive for these issues during the relevant period, both in the form of therapy and mental health medication. (R. 146-47). She then parsed through each of the "paragraph B" criteria, beginning with Claimant's moderate limitation in understanding, remembering, or applying information. She supported her conclusion that a moderate limitation in this area was warranted with record evidence that demonstrated that Claimant generally displayed intact recent and remote memory, could handle money, bank online, budget carefully, and was capable of using a pillbox and

11

effectively monitoring her own medication schedule. (R. 147). In finding Claimant had a moderate limitation in interacting with others, the ALJ noted that although there was some evidence that Claimant demonstrated irritability in dealing with medical staff at hospitals, (R. 819-20, 858), her activities of daily living suggested she was generally capable of social interaction. (R. 147). She was able to help out family members, including her nephew and father, in both day-to-day and emergency situations, and maintained relationships with others via text, computer chat, or by having dinner with friends once or twice a month. (R. 147).

Regarding Claimant's moderate limitation in concentration, persistence, or pace, the ALJ supported her conclusion by again citing to record evidence involving Claimant's activities of daily living; in particular, that despite complaints of inattention and distractibility, Claimant was able to concentrate adequately to drive a car to and from Florida, Chicago, and Indiana. (R. 147). Finally, as to adapting or managing herself, the ALJ also determined that Claimant had a moderate limitation and that no more severe restriction was warranted based on evidence that Claimant was able to walk her dog and exercise regularly, take care of her hygienic and nutritional needs, and do household chores as necessary. (R. 147).

Claimant essentially protests that the ALJ conducted her step three analysis in the wrong place and asks this Court to consider the ALJ's listing level analysis only within the four corners of the section of her decision specifically demarcated for step three. But as the Seventh Circuit has noted, "[t]he five-step evaluation process comprises sequential determinations that can involve overlapping reasoning. This is certainly true of step three and the RFC determination that takes place between steps three and four..." *Jeske v. Saul,* 955 F.3d 583, 590 (7th Cir. 2020) (citing 20 C.F.R. § 404.1520(a)(4)). The Court does not consider the ALJ's step three discussion in a vacuum, and nothing precludes the Court from reviewing an ALJ's step-three determination "in light of

elaboration and analysis appearing elsewhere in the decision." *Zellweger v. Saul,* 2021 WL 129658, at \*3 (7th Cir. 2021). "This type of complaint falls in the category of nit-picking a decision, and that is something district courts are not permitted to do when reviewing an ALJ's opinion." *Thomas K v. Saul,* 2020 WL 6565228, at \*4 (N.D. Ill. 2020) (citing *Burnam v. Colvin,* 525 F. App'x 461, 464 (7th Cir. 2013); *Castile v. Astrue,* 617 F.3d 923, 929 (7th Cir. 2010); *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir. 2000)).

Instead, the ALJ's opinion must be examined "as a whole to ascertain whether [she] considered all of the relevant evidence, made the required determinations, and gave supporting reasons for [her] decisions." *Orlando v. Heckler,* 776 F.2d 209, 213 (7th Cir. 1985). And here, the ALJ specifically put the parties, and this Court, on notice that she was aware of her obligation to support her step three analysis with more detail and record evidence when she stated that she would discuss Claimant's functional areas in more detail later in her opinion. (R. 139) ("I discuss these functional areas in detail below."). The ALJ did indeed combine her discussion of the "paragraph B" criteria from step three with her mental RFC assessment. *See, e.g., Rice v. Barnhart,* 384 F.3d 363, 370 n. 5 (7th Cir. 2004) ("it is proper to read the ALJ's decision as a whole, and…it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five"). The Court cannot disregard the ALJ's substantive discussion of Claimant's mental limitations simply because it appears elsewhere in the decision. *Imse v. Berryhill,* 752 F. App'x 358, 362 (7th Cir. 2018) ("The ALJ based his assessment on 'the signs, symptoms, and laboratory findings' of her impairments, which he analyzed in detail throughout the opinion."). In this Court's view, "[t]o require the ALJ to repeat such a discussion throughout his decision would be redundant." *Curvin,* 778 F.3d at 650.

Substantively, the ALJ's discussion of Claimant's mental limitations during her RFC analysis satisfied her "duty to articulate" at step three. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). Mere disagreement with the outcome of the ALJ's step three analysis does not entitle Claimant to reversal, particularly where the ALJ followed the necessary steps of the special technique in 20 C.F.R. § 404.1520a, though admittedly out of order. *Capman v. Colvin*, 617 F. App'x 575, 580 (7th Cir. 2015) ("[A]n ALJ's decision should not be overturned simply because the relevant analysis is set forth at a different step of the process."). As described above, the ALJ addressed Claimant's depression-related symptoms and used the correct framework, though she did not assign the significance to them that Claimant would prefer when she assessed only moderate limitations in the four functional areas. Because the ALJ supported her conclusion that Claimant had only moderate work-related limitations as a result of her mental health diagnoses with substantial evidence and followed the steps required of her as part of the special technique in 20 C.F.R. § 404.1520a, her analysis and conclusion will stand.

## II. The RFC Assessment and Claimant's Moderate Limitation in Concentration, Persistence, or Pace

Whether the ALJ erred in assessing Claimant's moderate limitations in the four functional areas, as discussed above, is separate from whether the ALJ ultimately accommodated those moderate limitations in the RFC and hypotheticals to the VEs. The Court discusses that issue in this section of its opinion. Here, Claimant argues that restricting her to "'unskilled work' with occasional interaction with public and co-workers and few work place changes" did not adequately account for her mental limitations; in particular, her documented limitation of concentration, persistence, or pace. [ECF No. 14] at 12-13. The Court agrees and remands for further proceedings on this limited issue.

The RFC is the maximum a claimant can still do despite her mental and physical limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96–8p. It is based upon the medical evidence in the record and other evidence, including testimony from the claimant and others. 20 C.F.R. § 404.1545(a)(3). All of a claimant's limitations must be incorporated into the ALJ's RFC assessment and the hypotheticals posed to the VE. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). Mental limitations, as relevant here, must be part of the RFC assessment because "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work." 20 C.F.R. § 404.1545(c).

Specifically, the hypothetical must account for documented limitations of "concentration, persistence or pace." *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004). "Though an RFC assessment need not recite the precise phrase 'concentration, persistence, or pace,' any alternative phrasing must clearly exclude those tasks that someone with the claimant's limitations could not perform." *Paul v. Berryhill*, 760 F. App'x 460, 465 (7th Cir. 2019) (citing *Moreno v. Berryhill*, 882 F.3d 722, 739 (7th Cir. 2018)). The Seventh Circuit has explained that "in most cases employing terms like simple, repetitive tasks on their own" is not enough to account for a claimant's limitations in concentration, persistence, and pace or temperamental deficiencies. *Winsted v. Berryhill,* 923 F.3d 472, 477 (7th Cir. 2019); *see also, Yurt*, 758 F.3d at 858-59. This is because, as the Social Security Administration has itself recognized, the "response to the demands of work is highly individualized," and therefore, "the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding

15

job." SSR 85–15. And there is "no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence, and pace." *DeCamp v. Berryhill*, 916 F.3d 671, 675 (7th Cir. 2019) (citing Moreno, 882 F.3d at 730; *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016)). This determination is, however, still to be made on a case-by-case basis, as it is possible that an RFC limited to simple, routine, and repetitive tasks may account for deficits in concentration, persistence, or pace when the record demonstrates that the RFC adequately captures a claimant's mental limitations. *See, e.g., Jozefyk v. Berryhill*, 923 F.3d 492, 495, 497-98 (7th Cir. 2019) (where a claimant's impairments only surfaced in social settings, the ALJ did not err in limiting the claimant to "simple, routine, repetitive tasks" that required limited-to-no social interaction).

In this case, the ALJ determined that Claimant had the RFC, from September 30, 2014 through May 14, 2015, to perform medium work, except that Claimant is "limited to work that involving [sic] simple, routine and repetitive tasks, in a work environment free of fast-paced production requirements, requiring only simple, work-related decisions, with few, if any, work place changes, and occasional interaction with the public and co-workers." (R. 139). Beginning on May 15, 2015, the ALJ found Claimant had the RFC to "perform light work as defined in 20 CFR 404.1567 subject to never climbing ladders, ropes or scaffolds, frequent stooping and crouching, avoidance of all exposure to use of dangerous moving machinery and unprotected heights. She remains limited to work involving simple, routine and repetitive tasks, in a work environment free of fast-paced production requirements, requiring only simple, work-related decisions, with few, if any, work place changes, and occasional interaction with the public and co-workers." (R. 139).

The ALJ based her RFC assessment, in part, on the testimony of two VEs at two separate hearings in 2017 and 2018. At Claimant's 2017 hearing, the ALJ's first hypothetical to the VE

asked whether there would be any work in the national economy for an individual of Claimant's same age, education, and work experience, provided the work was limited to medium work and "simple, routine, repetitive tasks, in a work environment free of fast-paced production requirements, involving only simple work-related decisions, with few if any workplace changes." (R. 56-57). The second hypothetical added an additional limitation of light work with "occasional interaction with the public and occasional interaction with coworkers," (R. 57), after which other hypotheticals were posed to the ALJ involving sedentary work, occasional rotation, flexion, and extension of the neck, off-task behavior, absences, and whether these jobs could be sustained by an individual only capable of concentrating for two hours at a time. (R. 58-61). The VE specified that these jobs would only be available if Claimant could maintain productivity 90% of the time and was not absent more than two days a month. (R. 60).

Similarly, at Claimant's 2018 hearing, the ALJ asked the VE whether work existed for an individual of Claimant's same age, education, and work experience, provided the work was limited to light work, certain physical restrictions, and "simple, routine, repetitive tasks, in a work environment free of fast-paced production requirements, involving only simple work-related decisions, with few if any workplace changes, occasional interaction with the public, and occasional interaction with coworkers." (R. 91-92). That VE also opined that an individual performing unskilled work could be off-task no more than 15% of the day, including two customary breaks, and could be absent only one day a month. (R. 92-93). [8]

_____

[8] Courts will sometimes assume a VE's familiarity with a claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations. But there is no evidence in this case on which this Court can rely that either VE reviewed Claimant's medical history, as opposed to just her work history, or heard testimony about her limitations beyond the hypotheticals above. Further, even were there evidence in the record that the VE was independently apprised of the contents of Claimant's medical records, this exception does not apply "where, as here, the ALJ poses a series of increasingly restrictive hypotheticals to the VE, because in such cases we infer that the VE's attention is focused on the hypotheticals and not on the record."

Here, the ALJ's conclusion that Claimant had moderate limitations in concentration, persistence, or maintaining pace was based on the ALJ's review of the medical evidence and hearing testimony and is, in the Court's view, generally supported by substantial evidence. (R. 139, 147). Notably, both state agency psychologists, to whom the ALJ gave some weight, also opined based on the record that Claimant had moderate limitations in concentration, persistence, or pace. (R. 108, 111-12, 121, 125-26, 148). So too did Claimant's therapist Mr. Buonomo describe that Claimant suffered from "significant impairment in mental activities involving memory, understanding, problem solving and concentration." (R. 492). Similarly, Dr. Greenberg, a Florida state consultative psychologist, noted that Claimant had a constricted affect, relatively slow psychomotor functioning with an anxious and depressed mood, a low average fund of information, quite slow thinking, and that she suffered from major depressive, post-traumatic stress, and panic disorders. (R. 142, 901). Ultimately, Dr. Greenberg opined that Claimant's prognosis was poor. (R. 142, 901).

Claimant herself also reported inattention and distractibility, (R. 147), and was documented as having "irritable behavior and angry outbursts" and "problems with concentration" as symptoms of her post-traumatic stress disorder. (R. 910). At various medical appointments, Claimant presented with "memory difficulty, constant headaches, pain and numbness in hands, difficulty focusing," (R. 429), "word finding problems," slurred speech, and difficulty concentrating on her words and losing her thoughts mid-sentence. (R. 432). Though she sometimes had medical examinations where no issues with her memory, concentration, or speech were noted, her complaints of decreased memory, headaches, anxiety, and crying were not infrequent. (R. 419, 909-10). A psychological evaluation in April of 2015 revealed that Claimant suffers from regular

---

*O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) (citing *Simila v. Astrue,* 573 F.3d 503, 521 (7th Cir. 2009); *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004)).

panic attacks, which cause "problems breathing," the feeling that "she needs to exit a situation," "tremors," "tense muscles," and "difficulty concentrating." (R. 900). And although Claimant was able to concentrate enough to drive independently on many occasions, (R. 901), her medical history and subjective symptom statements, as well as other evidence in the record, overall support the ALJ's conclusion that Claimant has moderate limitations in concentration, persistence, or maintaining pace. On balance, therefore, a moderate limitation in this area is supported by the record.

Although Claimant's limitations in concentration, persistence, or pace were well-documented, those limitations were not fully accounted for or considered in the RFC and the hypotheticals given to the VEs, nor did the ALJ connect the evidence to her conclusion through an accurate and logical bridge. *See, e.g., Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). While the ALJ did not use the words concentration, persistence, and pace – or language involving any of the four functional areas, for that matter – in her RFC or in the hypotheticals, she did attempt to use "alternative phrasing" to exclude types of work that someone with Claimant's limitations in those areas would not be able to perform. *O'Connor-Spinner*, 627 F.3d at 619 ("We also have let stand an ALJ's hypothetical omitting the terms 'concentration, persistence and pace' when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform."). The following four restrictions in the ALJ's hypothetical were targeted towards Claimant's mental limitations, including her moderate limitation in concentration, persistence, or pace: (1) "simple, routine, and repetitive tasks," (2) "a work environment free of fast-paced production requirements," (3) "simple work related decisions with few, if any, work place changes," and (4) "occasional interaction with the public and co-workers." (R. 139).

Taking each accommodation offered by the ALJ in turn, the ALJ's first restriction limiting Claimant's work to simple, routine, and repetitive tasks with only simple work-related decisions does not accommodate her moderate limitation in concentration, persistence, or pace. *DeCamp,* 916 F.3d 671; *Radosevich v. Berryhill*, 759 F. App'x 492, 495 (7th Cir. 2019); *Paul*, 760 F. App'x. at 465; *Varga*, 794 F.3d at 814-15; *Yurt*, 758 F.3d at 858-59; *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009) (emphasizing that the "Commissioner continues to defend the ALJ's attempt to account for mental impairments," i.e. limitations in concentration, persistence, or pace, "by restricting the hypothetical to 'simple" tasks,' and we and our sister courts continue to reject the Commissioner's position."). The Seventh Circuit has repeatedly cautioned that "someone with problems concentrating might not be able to complete a task consistently over the course of a workday, no matter how simple it may be." *Martin v. Saul*, 950 F.3d 369, 373–74 (7th Cir. 2020) (collecting cases). This is especially true where Claimant's "ability to remember and understand detailed instructions is impaired by the depression that impacts cognitive capacities" and her ability to "maintain concentration and attention for extended periods and to perform duties with consistent pace and persistence are impaired by the depression that impacts energy and motivation." (R. 112); *see, e.g., Craft,* 539 F.3d at 677-78 (restricting hypothetical to unskilled work did not consider difficulties with memory, concentration or mood swings).

The ALJ here provided no explanation for how or why the nature of a task – whether it is simple or complex – affects, beyond on a superficial level, the amount of time it would take someone with severe depression, anxiety disorder, and post-traumatic stress disorder to complete it. The ability to stay on task is different than the ability to perform simple tasks, and it is not clear to the Court how the ALJ's limitation captures the former given Claimant's particular limitations. *See, e.g., O'Connor-Spinner*, 627 F.3d at 620; *Ramirez,* 372 F.3d at 554 (restriction to simple one

or two-step tasks does not take into account deficiencies in pace where "[m]any employers require a certain output level from their employees over a given amount of time, and an individual with deficiencies in pace might be able to perform simple tasks, but not over an extended period of time.").

The ALJ's restriction to "occasional interaction with the public and co-workers" also misses the mark. Such accommodations deal with workplace adaptation, such as Claimant's moderate limitation in interacting with others, rather than concentration, persistence, or pace. *Varga*, 794 F.3d at 815 ("'Few if any work place changes' with limited 'interaction with coworkers or supervisors' deals largely with workplace adaptation, rather than concentration, pace, or persistence."); *see also, Mischler v. Berryhill*, 766 F. App'x 369, 376 (7th Cir. 2019); *Moreno,* 882 F.3d at 730. Nor does eliminating "production rate pace tasks" account for Claimant's limitations in pace, especially where, as here, the ALJ's explanation of the RFC says nothing about whether Claimant is capable of performing even simple tasks at a sustained pace over an entire workday. The state agency psychologist, Dr. Meyer, seemed to recognize as much when she noted that Claimant would likely only be able to "sustain[] attention to complete simple, repetitive tasks for 2-hour segments over an 8 hour work day" – a limitation that the ALJ did not incorporate into the RFC, despite raising it as a concern with the VE in Claimant's 2017 hearing. (R. 61, 126) ("Q: So if a person were limited to concentrating on – in blocks of about two hours, would that limit – eliminate these jobs? A: Yeah, if the amount of time off task was enough to get the person's focus of attention back, yes, the jobs would remain. Productivity should not be affected."). And although jobs could possibly still be available to Claimant if she were only able to concentrate in two-hour blocks, the VE emphasized that this would only be true if Claimant were able to regain her focus using no more than the 10% off-task time allotted to her for the entire work day. (R. 60-61). But

the ALJ's decision did not address one way or another whether Claimant could in fact meet that requirement, or why she discounted Dr. Meyer's opinion that limiting Claimant to two-hour attention blocks was necessary to accommodate Claimant's moderate limitations in concentration, persistence, or pace.

So too is the Court's evaluation of the RFC assessment hampered by the fact that the ALJ left the term production-rate tasks undefined. *See, e.g., Varga,* 794 F.3d at 815 (finding the ALJ's hypothetical deficient and noting the ALJ's failure to define "fast-paced production" was "problematic" and rendered it "impossible" for the VE to accurately assess limitations in pace); *Mischler,* 766 F. App'x at 376 (failure to define "piecework" or "fast-moving assembly line work" "makes it impossible for a VE to assess whether a person with those limitations 'could maintain the pace proposed.'"); *DeCamp,* 916 F.3d at 675–76 (rejecting restrictions of "unskilled work" with no "fast-paced production line or tandem tasks" "because there is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence, and pace."). Without clarification or explanation, the term "production rate pace tasks" leaves the VEs and this Court to guess whether Claimant could perform at the pace required of the jobs identified by the VEs at Claimant's hearings in 2017 and 2018. This is especially true where eliminating production-rate tasks was the only accommodation apparently made for Claimant's limitations in pace.

The Court recognizes there are circumstances in which limiting a Claimant to simple, repetitive, and low-production tasks will account for a moderate limitation in concentration, persistence, or pace, as the Seventh Circuit has acknowledged. But many of these cases involve claimants whose limitations in concentration, persistence, or pace are stress- or panic-related and the hypothetical restricts the claimant to low-stress work. For example, in *Johansen v. Barnhart,*

314 F.3d 283 (7th Cir. 2002), the Seventh Circuit found that a hypothetical excluding "repetitive, low-stress" work adequately accounted for symptoms of the stress-related panic disorder that lay at the root of the claimant's moderate limitations on concentration, persistence or pace. *Id.* at 285, 288-89; *see also, Arnold v. Barnhart,* 473 F.3d 816, 820, 823 (7th Cir. 2007) (hypothetical restricting the claimant to low-stress, low-production work was adequate where the claimant's difficulties with concentration, persistence or pace arose from stress-induced headaches, frustration and anger.). In this case, although Claimant does suffer from a panic-related disorder, the record suggests that her limitations in concentration, persistence, or pace are more than just panic-related. Her severe depression and anxiety disorder, as Dr. Thibodeau noted, affect Claimant's energy and motivation, as well as her cognitive capacities – which in turn affect her ability to concentrate or maintain pace. (112). This is not a situation like *Johansen* or *Arnold* where a claimant's stress or panic-related disorder can be directly accounted for by eliminating the stress underlying the claimant's condition and limiting him or her to low-stress, repetitive work.

Without more targeted explanation by the ALJ as to how the hypotheticals and RFC accommodate Claimant's depression-related moderate functional limitations, this Court cannot reconcile the ALJ's finding that Claimant had moderate limitation regarding concentration, persistence, and pace with the accommodations in the RFC. Ultimately, it falls to the ALJ to adequately discuss the issues and build an accurate and logical bridge from the evidence to her conclusion. *McKinzey v. Astrue,* 641 F.3d 884, 889 (7th Cir. 2011). The Court is not convinced on this record that the ALJ did so here, and so remand on this point is required.

### III. The ALJ's Assessment of Opinion Evidence and Claimant's Subjective Symptom Reports

Finally, Claimant vaguely argues that the ALJ improperly weighed opinion evidence from three sources: Mr. Buonomo, Dr. Gillala and Dr. Bruce Montella. [ECF No. 14] at 13-14. She also

takes issue with the ALJ's conclusion that her subjective reports of "disabling symptoms and limitations are not fully consistent with the objective and clinical findings." (R. 145); [ECF No. 14] at 14. Both arguments are unavailing.

Turning first to the ALJ's decision to give "some weight" to Mr. Buonomo's opinion, Claimant implies that Mr. Buonomo, as Claimant's "treating therapist," should be afforded similar weight to that of a "treating physician" under the regulations. This is incorrect, as the regulations specifically provide two different frameworks for the evaluation of treating source medical opinions and opinions from "medical sources who are not acceptable medical sources," regardless of whether they "treated" the claimant.[9] 20 C.F.R. § 404.1527. While a treating physician's opinion is entitled to controlling weight if well supported by medical findings and not inconsistent with other substantial evidence, 20 C.F.R. § 404.1527(c)(2), no such presumption exists for an unacceptable medical source. An ALJ should consider evidence from an unacceptable medical source, or nonmedical source, but does not need to do more than explain the weight given to that source. 20 C.F.R. § 404.1527(f).

Here, the ALJ correctly determined that Mr. Bounomo was not an acceptable medical source, given that he is a mental health counselor, not a physician or psychologist. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a) (providing that acceptable medical sources include licensed physicians and psychologists); SSR 06–03p, 2006 WL 2329939, at *1–2 (Aug. 9, 2006) (explaining that medical sources include both acceptable medical sources and other health care providers who are not acceptable medical sources). She then explained that she was affording his opinion only "some weight" during the period he treated Claimant because although he provided a useful summary of

---

[9] The mere fact that Mr. Buonomo "treated" Claimant is not dispositive, nor does it render him a "treating" medical source entitled to controlling weight. *See* 20 C.F.R. §§ 404.1513(d)(1), 404.1527(c), 416.913(d)(1), 416.927(c); SSR 06–03p, 2006 WL 2329939, at *2, *6 (explaining that "only 'acceptable medical sources' can be considered treating sources…whose medical opinions may be entitled to controlling weight").

Claimant's symptoms, he did not assess any specific functional limitations and was not, because of his status as a mental health counselor, an acceptable source for diagnosis under the regulations. (R. 148). In sum, the ALJ explained her reasoning well enough to satisfy 20 C.F.R. § 404.1527(f) and this Court.

Claimant next takes issue with the ALJ's treatment of Dr. Gillala's opinion. Dr. Gillala is a doctor of osteopathy with board certification in physical medicine and rehabilitation. The ALJ sent Dr. Gillala written interrogatories, presumably hoping, given Dr. Gillala's area of medical expertise, for a response that would clarify the extent of Claimant's physical limitations. (R. 922-938). Yet in response to the interrogatories, Dr. Gillala summarily concluded that Claimant met the criteria for a mental health related listing (despite her lack of training, qualifications, or expertise in that area) and provided no substantive opinion regarding Claimant's physical limitations at all (which she would have been amply qualified to do). (R. 925-28). Understandably, the ALJ gave little weight to Dr. Gillala's opinion and more than adequately explained her reasons for doing so. Dr. Gillala is not a mental health professional and did not support her conclusion that Claimant met listing 12.04 with any analysis of evidence in the record, nor did she discuss any of Claimant's functional limitations. (R. 148). The ALJ made no error in assigning little weight to Dr. Gillala's opinion, and her explanation suffices.

Claimant repeatedly complains in her briefs of the "iron[y]" that the independent medical expert called at Claimant's second hearing to "clarify" Dr. Gillala's opinion was an orthopedic surgeon and not a mental health professional. [ECF No. 14] at 10, 11. According to Claimant, if the ALJ was confused about Dr. Gillala's opinion that Claimant met listing 12.04 or was not going to accept it, then she should have called a mental health professional to clarify Claimant's mental limitations at the second hearing. Otherwise, Claimant seems to argue, the ALJ was required to

accept Dr. Gillala's uncontradicted opinion that Claimant met listing 12.04 and find Claimant disabled. This argument fundamentally misapprehends why the ALJ initially requested Dr. Gillala's opinion and why she subsequently sought an opinion from Dr. Rohr, an orthopedic surgeon, at Claimant's second hearing. The ALJ was not confused about the substance of Dr. Gillala's two-sentence opinion that Claimant met listing 12.04 because, to be blunt, there was simply no substance to it. Dr. Gillala was not qualified to render it, and she provided no record or medical support for her conclusion. Rather, from the beginning, the ALJ needed a medical opinion about Claimant's physical limitations, which is why, after striking out with Dr. Gillala, she contacted Dr. Rohr. The ALJ did not need another mental health assessment; the record is replete with them. There is no irony (or error) here, only a legitimate and appropriate attempt by the ALJ to obtain a medical opinion concerning the extent of Claimant's physical limitations.

As for Dr. Montella, he is an orthopedic specialist and pain management doctor who briefly treated Claimant. (R. 144). Claimant saw Dr. Montella three times in 2016 – on May 11th, June 8th, and June 27th – to address pain and physical injuries from Claimant's two car accidents in 2015. (R. 144). During those visits, Dr. Montella prescribed marijuana and Norco to address Claimant's pain, and also recommended that Claimant engage in physical therapy. (R. 144-45). And on Claimant's third visit, on June 27, 2016, Dr. Montella opined that Claimant was "on long-term narcotic usage for pain management, and he supported her full and total disability." (R. 145).

At the time Claimant filed her application, a treating physician's opinion was entitled to controlling weight if well supported by medical findings and not inconsistent with other substantial evidence. 20 C.F.R. § 404.1527(c)(2). If a treating physician's opinion is not given controlling weight, the ALJ is required to consider specific factors – including the length, frequency, and nature of the treating relationship, as well as frequency of examination and the physician's

specialty – in determining what weight, if any, to afford the opinion. *Id.*; *see also, Bauer v. Astrue,* 532 F.3d 606, 608 (7th Cir. 2008) (stating that when the treating physician's opinion is not given controlling weight, "the checklist comes into play"). If the ALJ adequately considers these factors, her decision is entitled to deference. *Winsted,* 923 F.3d at 478 (citing *Elder,* 529 F.3d at 416).

Here, the ALJ considered the appropriate factors for a treating physician's opinion when she discounted Dr. Montella's assessment, noting first that he had a short and infrequent treating relationship with Claimant. (R. 145, 149). He saw her only three times in less than two months, and although Claimant was supposed to return in two weeks for a follow-up, she did not return for treatment after Dr. Montella provided his opinion that Claimant was wholly disabled. (R. 145, 149). Although the ALJ noted Dr. Montella's specialty was in a relevant field (orthopedics and pain management), (R. 144), she also considered that Dr. Montella's opinion was not supported by the objective medical evidence when she discounted the weight she would give it. (R. 149). For example, although Dr. Montella opined that Claimant required narcotic pain medication for her severe pain and that she was on "long-term narcotic usage," the ALJ noted that both of Claimant's drug screens with Dr. Montella's office were negative for Norco or any other narcotic pain medication, suggesting that Claimant was not actually taking the Norco as prescribed and perhaps did not need it to manage her pain. (R. 145, 577, 580). he ALJ went through the checklist required of her and articulated good reasons for giving Dr. Montella's opinion less than controlling weight. Her decision will stand. 20 C.F.R. § 404.1527(d)(2) (an ALJ who does not give controlling weight to the opinion of the claimant's treating physician must offer "good reasons" for declining to do so); *see also, Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

Finally, Claimant complains that the ALJ improperly rejected her subjective symptom reports about her mental and physical limitations. An ALJ's evaluation of a claimant's subjective

symptom statements will be upheld unless it is "patently wrong." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). "SSR 96–7p provides a two-step test for adjudicators to follow when evaluating a claimant's symptoms such as pain." *Maske v. Astrue*, 2012 WL 1988442, at *11 (N.D. Ill. 2010). First, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96–7p., 61 Fed. Reg. at 34484. Second, if there is such an impairment, "the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id*. at 34485. The ALJ must justify his or her subjective symptom evaluation with "specific reasons supported by the record," *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), and in doing so, must consider several factors, including the objective medical evidence, the claimant's daily activities, his level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, *7-8 (Oct. 25, 2017).

Here, the ALJ properly considered the extent to which the objective medical evidence supported the degree of severity of Claimant's subjective complaints; the duration, frequency, and intensity of the pain; medications taken; and treatment. *Scheck*, 357 F.3d at 703 (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). She explained that Claimant's level of treatment for her physical and mental conditions was relatively infrequent, and that Claimant did not appear to avail herself of the medication or physical therapy recommended to her for pain management. (R. 146-47). So too did Claimant's activities of daily living suggest that she was not as disabled during the relevant time period as she portrayed herself to be. (R. 146) ("[S]he traveled back and

forth between Illinois, Indiana and Florida throughout the period at issue, consistent with the findings reached in this decision that her alleged disabling symptoms did not preclude her from pursuing a wide range of activity ('F' Exhibits)."); (R. 147) ("The claimant helped family members out, including her nephew and father. She was involved in an accident in Chicago, Illinois, and she managed to get to a South Bend, Indiana hospital, as her father was there so she could see him. She helped her father out when he had surgery and assisted him with eviction and a lawsuit against him (17F). She listed a friend, Joe Donnell, the social security administration could contact for information about her (2E/1). She texts, computer chats, and will go out to dinner once or twice a month[] or to a friend's home (6E/6). She told a physical therapist she was too busy to do the home exercises and was attending a concert when she returned (13F/160).") ("She can take care of herself, showering, feeding herself, and doing household chores, when up to it (6E).").

Further, unlike this Court, the ALJ "had the opportunity to observe the claimant testifying, and, as Justice Jackson rightly observed more than a half-century ago, 'a few minutes observation…in the courtroom is more informing than reams of cold record.'" *Brenda L. v. Saul,* 392 F. Supp. 3d 858, 864 (N.D. Ill. 2019) (quoting *Ashcraft v. State of Tenn.,* 322 U.S. 143, 171 (1944) (Jackson, J., dissenting)). The ALJ was required to explain her subjective symptom evaluation "in such a way that allows [the Court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (internal quotations omitted). She did so here, particularly given credibility determinations are due special deference as factual findings. *Scheck*, 357 F.3d at 703. Claimant offers no meaningful reason the ALJ's credibility determination should not be upheld, [ECF No. 14] at 15, nor does this Court believe the ALJ was patently wrong in her assessment in this case.

**CONCLUSION**

For the reasons discussed above, Claimant's Motion for Summary Judgment [ECF No. 14] is granted in part, and the Commissioner's Motion [ECF No. 23] is denied in part. This matter is remanded to the Social Security Administration for further proceedings consistent with this Memorandum Opinion and Order.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated: February 2, 2021